UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
DARRYL WHITLEY                          :
                                        :       **OPINION AND ORDER**
                        Petitioner,     :       **GRANTING PETITIONER'S**
                                        :       **MOTION TO STAY**
            -against-                   :
                                        :       06 Civ. 10198 (AKH)
ROBERT E. ERCOLE, Superintendent, Green :
Haven Correctional Facility,            :
                                        :
                        Respondent.     :
-------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        On August 3, 2006, petitioner Darryl Whitley filed a petition for a writ of habeas

corpus in this Court, seeking review of the constitutionality of his convictions and of his sentence

pursuant to 28 U.S.C. § 2254.  By papers dated November 28, 2006, Petitioner moved the New

York State trial court in which he was convicted to vacate his conviction pursuant to New York

Criminal Procedure Law ("N.Y. C.P.L.") § 440.10.  Approximately six weeks later, by papers

dated January 10, 2007, Petitioner moved this Court for an order staying his federal habeas

petition pending the New York court's resolution of Petitioner's N.Y. C.P.L. § 440.10 motion.

See Motion (document no. 9, entered Jan. 22, 2007).  On January 19, 2007, Respondent moved

to dismiss the petition because certain of its claims were unexhausted pursuant to 28 U.S.C.

§ 2254(b)(1).  For the reasons stated below, Respondent's motion to dismiss the petition for

Petitioner's failure to exhaust his claims is DENIED, and Petitioner's motion to stay the petition

is GRANTED.

## Background

        Dr. John Chase Wood was murdered on November 2, 1981, the day after his

thirty-first birthday, as he returned to work at Columbia Presbyterian Hospital.  He left behind a

wife, four months pregnant, and a community shocked at his killers' senseless brutality.  <u>See</u>
Barbara Basler, <u>Surgeon's Slaying Stuns Upper West Side</u>, N.Y. TIMES, Nov. 4, 1981 at B1.
Despite the New York Police Department's best efforts, however, his assailants escaped
immediate capture.  <u>See</u> Leonard Buder, <u>Leads Are Sought in Fatal Shootings</u>, N.Y. TIMES, Dec.
27, 1981 at A43.  Thirteen years later, on the strength of new evidence provided by jailhouse
informants, the State indicted Patrick R. McDowell for shooting and killing Dr. Wood with a .22
caliber revolver.  On March 24, 1995, the State indicted petitioner Darryl Whitley as an
accomplice to McDowell.

Following the indictments, Whitley and McDowell were tried separately, with
both trials resulting in a hung jury.  After his second trial, McDowell was acquitted of all charges
by a verdict delivered in December of 1997.  Whitley's second trial began January 23, 2002, and
ended on February 6, 2002, when the jury found Whitley guilty of second-degree murder.  On
April 18, 2002, Whitley was sentenced to an indeterminate prison term of 22 years to life.

## I.      Evidence Presented at Trial

At trial, the State presented witnesses who testified that Whitley had admitted his
participation in the murder of Dr. Wood to them, and witnesses who testified that they heard the
gunshot and saw the perpetrators from a distance.  The State presented no physical evidence.
Whitley invoked his right to present no evidence in his defense.

### A.   <u>Testimony of Glenn Richardson</u>

At Whitley's first trial, Glenn Richardson testified that he knew Whitley and
McDowell in 1981, and that the three had grown up on the same block.  Richardson also testified
that in the fall of 1981, he lent McDowell a .22 caliber revolver.  Some time after Richardson
heard about the Wood homicide, he asked McDowell to return the gun.  McDowell replied that

he would not give the gun back because "it was dirty," meaning that it had been fired. Richardson testified that he did not believe McDowell, that he asked Whitley to find out what had happened to the gun, and that Whitley responded by asking Richardson if he had heard about the doctor who was killed on Riverside Drive.  Richardson testified that he told Whitley that he had heard about the doctor, and that Whitley grew silent and said, "he didn't have to do it." Whitley then told Richardson that he and McDowell were looking for people to rob on Riverside Drive, and that McDowell shot the doctor.  Richardson said the gun was not returned.

Like all the witnesses who testified that Whitley had admitted his involvement in the Wood homicide, Richardson's cooperation was procured by the lead detective on the case, Gennaro Giorgio.  At the time Richardson agreed to cooperate, he was facing a prison sentence of twenty years to life for a federal drug charge.  As part of a plea bargain, which included a substantial reduction in sentence, Richardson signed a cooperation agreement with the federal government, whereby he would assist federal, state and local agencies with any cases they had pending.  However, after Whitley's first trial ended in a hung jury, Richardson recanted his testimony and refused to testify at Whitley's second trial.  Over objection from defense counsel, Richardson's testimony from Whitley's first trial was then read into the record at Whitley's second trial.

B.  Testimony of Bernard Barnes

Bernard Barnes appeared at Whitley's second trial under subpoena.  Barnes testified that he had visited Whitley at Rikers Island in 1982 and that during the visit, Whitley told Barnes that he had been arrested for the robbery of a doctor, that the doctor had put up a struggle, and that the gun had fired.  On cross-examination, Barnes admitted that he had been using drugs heavily at the time he made statements about Whitley to detectives.  Barnes also

acknowledged that he became involved with the case because he had been arrested for selling

crack, and that Giorgio had offered him a bargain for his assistance enabling Barnes to walk out

of the precinct police station that day and gain his freedom.

C.   Testimony of Donald Caines

     In 1995, Donald Caines spoke with Detective Giorgio, and told him about a

conversation he had with Whitley in 1985, when they were both housed at the Mt. McGregor

Correction Facility.  Caines told Giorgio that Whitley had admitted involvement in the Wood

homicide.  Caines also alleged that Whitley had told him that during the robbery, McDowell had

been shot in the foot, and Whitley and McDowell had been caught because the ballistics from

McDowell's gunshot wound matched the ballistics from the Wood homicide.  After Caines

testified, however, the parties stipulated that the ballistic evidence recovered from McDowell's

gunshot wound in the foot did not match the ballistic evidence recovered from the bullets that

killed Dr. Wood.  Defense counsel attempted further to impeach Caines's testimony by

presenting evidence of the benefits Caines had received from the prosecution, including money

in excess of $1000, and evidence that Caines had previously lied under oath.

D.   Testimony of Gregory Howard and Ricky Darlington

     Gregory Howard first spoke to Detective Giorgio in 1995 while he was in jail for

a parole violation.  Howard testified that in November 1981, he was questioned by police about

the Wood homicide.  Shortly thereafter, Howard and Whitley had a conversation about the police

questioning in the presence of Ricky Darlington.  Howard explained to Whitley that he had been

picked up "for this doctor thing."  Howard testified that Whitley responded, "[W]hat'd they pick

you up for?  It was me and [McDowell] down there, we did the doctor."  Darlington testified that

he understood Whitley to mean that Whitley and McDowell killed Dr. Wood.

E.  Testimony of Detective Gennaro Giorgio

Detective Giorgio testified that he had been working on the Wood homicide since 1981, and that he interviewed Whitley in 1994 regarding the Wood homicide.  When Giorgio told Whitley that others had mentioned Whitley as the person with McDowell when Dr. Wood was killed, Whitley responded, "You don't have no case against [McDowell].  The only way you're going to get [McDowell] is through me …."

F.  Eyewitnesses

The prosecution produced four eyewitnesses who testified to being in the vicinity of the homicide and hearing the gunshot.  Three of the eyewitnesses claimed to have seen the perpetrators, but said that it was too dark to make out their faces.  Dorothy Howze, the fourth eyewitness, was closest to the incident, and ran to Dr. Wood's aid after the shooting.  In 1994, Howze was presented with a photo array that contained Whitley and McDowell.  Howze identified McDowell, saying that she was not one hundred percent sure about his identification, but perhaps ninety percent sure.  She did not identify Whitley.

II.  **Richardson's Recantation**

During pretrial proceedings before Justice Budd Goodman on November 26, 2001, in advance of Whitley's second trial, Richardson was asked about his prior statement that Whitley had admitted involvement in the murder.   Richardson stated that he had no recollection of the statement, and refused to say whether his prior statement was true, or not.  Justice Goodman adjourned the hearing to permit Richardson to "jog his memory" and avoid a contempt of court citation.

When Richardson returned to court on January 8, 2002 for proceedings before Justice Laura E. Drager, his lawyer informed the court that if called to the stand, Richardson

would invoke his Fifth Amendment privilege against compelled self-incrimination in a criminal

case against him.  Richardson's lawyer explained that he anticipated that Richardson's testimony

at the second trial would expose Richardson to perjury prosecution because it would deviate

from his testimony at the first trial.  The next day, Justice Drager asked Richardson's attorney

what Richardson's testimony would be if called to testify at Whitley's second trial.  Richardson's

attorney indicated that he would recant his prior testimony, stating:

> I believe he would say that he wasn't sure, and never was positive that [Whitley]
> said to him that he was present and participated in the robbery of the doctor, and
> was actually present when the doctor was shot by [McDowell], but that he felt
> pressure, indirectly.
>
> Because nothing was specifically said by [the Assistant District Attorney] that
> would direct him as to how to answer, but that he felt pressure to say that he was
> sure [Whitley] had said to him that he was present and participated in the robbery,
> and witnessed the doctor being shot by a codefendant.

Pretrial Tr. at 156 (Jan. 9, 2002).

Justice Drager ruled that Richardson's decision to invoke his Fifth Amendment

qualified him as an unavailable witness, that the State had no obligation to confer immunity from

perjury prosecution on Richardson to procure his testimony, and that the State could introduce

Richardson's prior trial testimony to the jury at Whitley's second trial.  See id. at 189.  Relying

on Bagby v. Kuhlman, 932 F.2d 131 (2d Cir. 1991), Justice Drager held that because "there

[was] overwhelming reason to doubt the genuineness of Mr. Richardson's recantation" and that it

was "not worthy of belief," Pretrial Tr. at 188, 189, Whitley had no right to cross-examine

Richardson further.  Justice Drager reasoned that Richardson had not alleged that the prosecution

coerced him to testify against Whitley; Richardson only that said that he had a "feeling" that the

District Attorney wanted him to testify in a certain way, and absent specific allegations of

coercion, Whitley was not entitled to cross-examine Richardson.

Whitley's attorney objected to these rulings and asked Justice Drager for the opportunity to <u>cross-examine</u> Richardson with respect to the statements Richardson had made before Justice Goodman, but did not specifically request the opportunity to <u>read</u> those statements to the jury at Whitley's second trial.  <u>See id.</u> at 190–99.  Justice Drager denied the request, stating:

> You would not have the opportunity to cross examine Mr. Richardson at all, if I were to accept the present version of what his testimony would be, because neither side would be able to call him as a witness because he has no relevant testimony; either inculpatory or exculpatory.  He doesn't remember having—he doesn't have a clear recollection of the testimony of his conversation with Mr. Whitley, as including any inculpatory statement.  There is nothing to testify about.

<u>Id.</u> at 199.

At Whitley's second trial, Richardson's prior statements were read to the jury, which was instructed not to draw any inferences about Richardson's absence.[1]  The jury did not hear evidence that Richardson had recanted his statements.

## III.    Whitley's Appeal

On appeal to the Appellate Division of the New York Supreme Court, Whitley argued, among other things, that the introduction of Richardson's prior testimony, without any reference to the witness's subsequent disavowal of his testimony, violated his due process right to a fair trial and his Sixth Amendment right to confront all witnesses against him.

The Appellate Division affirmed Whitley's conviction, holding that the trial court did not err by admitting Richardson's prior testimony, by refusing to order limited immunity for Richardson, or by precluding the defense from presenting evidence of Richardson's recantation. The court rejected Whitley's Confrontation Clause claim, finding that Richardson had become an

---

[1] I have previously held, in a different context—the witness had not previously testified—that a jury may draw an adverse inference against a non-party government witness who claims his Fifth Amendment privilege on cross-examination, and the defense requests that an adverse inference be drawn.  <u>See</u> <u>United States v. Colasuonno</u>, No. 05 Cr. 1110, 2006 U.S. Dist. LEXIS 77587 (S.D.N.Y. 2006).

"unavailable witness" when he asserted his Fifth Amendment privilege against testifying.

People v. Whitley, 14 A.D.3d 403, 404 (N.Y. App. Div. 2005).  Because Richardson had been

"extensively cross-examined" during his prior testimony, the court found that the "constitutional

requirements of unavailability and prior cross-examination were met."  Id. at 405 (citing Barber

v. Page, 390 U.S. 719, 722 (1968)).  The Appellate Division also found that the People had

"properly refused to immunize" Richardson.  Id.

         As to Whitley's argument that the trial court erred by refusing to allow the

defense to read Richardson's pretrial testimony before Justice Goodman to the jury—Richardson

had testified that he did not remember and therefore could not confirm his prior statements about

Whitley's culpability—the court ruled that this ground of alleged error was "unpreserved

because, at trial, [Whitley] never requested that remedy." Id. (citing People v. Lombardo, 61

N.Y.2d 97, 104 (1984)).[2]  Further, the Appellate Division commented, had it reviewed this

ground, it would have found that the defendant was not entitled to read Richardson's recantation

because a proper foundation could not be laid for asking Richardson about the recantation.  Id.

(citing Mattox v. United States, 156 U.S. 237, 244–50 (1895).[3]  Even if such foundation could be

---

[2] For discussion of New York's contemporaneous objection rule and of the federal standard for evaluating whether a state court's ruling based on the rule is adequate and independent, see Cotto v. Herbert, 331 F.3d 217, 238–47 (2d Cir. 2003).

[3] In Mattox v. United States, the Supreme Court commented:

> The authorities, except in some of the New England states, are almost unanimous to the effect that, before a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements. Justice to the witness himself requires not only that he should be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced.

156 U.S. at 245–46.  The federal courts no longer no longer require the proponent to lay such foundation. See Fed. R. Evid. 806 ("Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.").  Whether the state courts may require such foundation is not, of course, before me on this motion.

laid, the court continued, "[it] would find no basis for reversal because the recantation was highly suspect, and there is no reasonable possibility that its introduction would have affected the verdict." <u>Id.</u>

On May 16, 2005, the New York Court of Appeals denied Whitley's motion for leave to appeal the Appellate Division's decision affirming his conviction.

## IV.     Whitley's Federal Habeas Proceedings

On August 3, 2006, Whitley, proceeding <u>pro se</u>, timely filed a petition for a writ of habeas corpus in this Court.  His petition moves the Court to consider six grounds as a basis for granting the petition.  Petitioner argues 1) that his rights to confrontation and due process of law were violated by the prosecution's introduction of a recanting witness's prior testimony and the trial court's refusal to admit evidence of the witness's recantation of that testimony; 2) that his right to due process was violated by admission of prior crime evidence; 3) that prosecutorial misconduct during summation deprived Petitioner of a fair trial insofar as the prosecutor appealed to the jurors' sympathy for the victim, inflamed their passions, and vouched for the credibility of State witnesses; 4) that his right to a speedy trial was violated by the pre-indictment delay of thirteen years; 5) that the trial court improperly allowed the prosecution to admit prior consistent statements of three witnesses given that these witnesses had a motive to lie when they gave the prior statements; and 6) that his right to effective assistance of counsel was violated because trial counsel failed to (i) investigate and present a compelling third-party culpability defense; (ii) advise Whitley as to whether he should accept the State's plea offer; and (iii) preserve the recanted testimony issue for appeal.  <u>See</u> Petition, No. 06 Civ. 10198 (document no. 1, entered Oct. 26, 2006).

On November 9, 2006, I directed the Clerk of Court to serve a copy of the petition on Respondent, and ordered Respondent to file an answer or other pleadings within 60 days, along with all decisions, transcripts, and other filings from the state courts. Before Respondent answered, by papers dated November 28, 2006, Petitioner moved the New York State trial court in which he was convicted to vacate his conviction pursuant to N.Y. C.P.L. § 440.10.[4] Petitioner's motion to stay the instant petition followed on January 10, 2007.

On January 19, 2007, Respondent moved to dismiss the petition because certain of its claims were unexhausted pursuant to 28 U.S.C. § 2254(b)(1). I directed Respondent to submit a memorandum of law in opposition to all of Petitioner's habeas claims so that I could review them on the merits. On March 16, 2007, Respondent filed a 116-page memorandum of law in opposition to the petition for a writ of habeas corpus, accompanied by exhibits and transcripts. In the course of my review, I determined that aspects of the petition, particularly the first and sixth grounds for habeas review, seemed to have sufficient arguable merit as to justify appointment of counsel and, on July 11, 2007, I appointed Barry R. Ostrager and Simpson Thacher & Bartlett LLP, to represent Petitioner. With the benefit of counsel, on July 17, 2007, Petitioner filed a reply brief in support of his motion to stay his federal habeas petition. The motion is now ready for decision.

## Discussion

Petitioner has filed a mixed petition—that is, a petition alleging exhausted and unexhausted claims. See Rose v. Lundy, 455 U.S. 509 (1982). Petitioner's ineffective assistance of counsel claim is unexhausted; his remaining claims are ripe for adjudication. The question is

---

[4] On April 16, 2007, the New York Supreme Court for New York County denied Whitley's N.Y. C.P.L. § 440.10 motion. See Whitley Aff. ¶ 7. On June 13, 2007, Whitley moved the Appellate Division, First Department, for leave to appeal the denial of his "440.10" motion. The motion has not been decided. See id. ¶ 8.

whether to stay the petition to permit Petitioner to exhaust his unexhausted ineffective assistance of counsel claim.

I.     **Rhines v. Weber**

    A.  The Decision of the United States Supreme Court

              In Rhines v. Weber, the United States Supreme Court stated three conditions that must be satisfied before the district court may grant a petitioner's motion to stay a mixed habeas petition.  A petitioner must show 1) that he had good cause for his failure to exhaust; 2) that his unexhausted claims are potentially meritorious; and 3) that he did not engage in intentionally dilatory litigation tactics.  544 U.S. 269, 277–78 (2005) (O'Connor, J.).  If the petitioner fails to satisfy these conditions, the district court should dismiss the petition or permit the petitioner to proceed on his exhausted claims "if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief."  Id. at 278.  If the petitioner satisfies all three conditions, on the other hand, "the district court should stay, rather than dismiss, the mixed petition."  Id.

              The rule that districts courts must deny a habeas petitioner's motion to stay a mixed petition unless the "court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," id. at 277, does not appear in the text of the statutes and regulations governing the administration of habeas corpus proceedings in the federal courts.  See id. at 276 ("[The Antiterrorism and Effective Death Penalty Act of 1996] does not deprive district courts of [the authority to issue stays]").  The Rhines Court reasoned, nevertheless, that any stay-and-abeyance procedure must be compatible with the purposes for which Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), an act that "dramatically altered the landscape for federal habeas corpus petitions," id. at 274, and imposed the rule.

The Supreme Court identified AEDPA's "twin purposes" as finality, see id. at 277 ("AEDPA's objective of encouraging finality"), and efficiency, see id. ("AEDPA's goal of streamlining federal habeas proceedings.").  The state and federal interest in reducing "delays in the execution of state and federal criminal sentences, particularly in capital cases," id. at 276, is served in two similar, but distinct, ways.  First, AEDPA's one-year limitations period "reduces the potential for delay on the road to finality by restricting the time a prospective federal habeas petitioner has in which to seek federal habeas review.  Id. (emphasis added).  Second, the rule created by Rhines itself reduces the potential for delay by limiting the circumstances in which a petitioner may delay the resolution of a pending federal habeas petition.  The federal interest in efficiency, or "streamlining federal habeas proceedings," is served by AEDPA's exhaustion requirement, which is designed to reduce "piecemeal litigation."  Id. at 277.

B.  Interpretations of Rhines in the United States District Courts

The Supreme Court left the first of the three Rhines conditions—"good cause"— undefined.  See e.g., Torres v. Graham, No. 06 Civ. 785, 2007 U.S. Dist. LEXIS 30517 (E.D.N.Y. Apr. 20, 2007) ("Neither the Supreme Court nor any circuit court has defined what constitutes 'good cause' for a failure to exhaust."); Fernandez v. Artuz, No. 00 Civ. 7601, 2006 WL 121943 (S.D.N.Y. 2006) (same).  A substantial number of lower courts that have considered the meaning of "good cause" have analogized it to "the requirement that a habeas petitioner demonstrate 'cause' to excuse other types of procedural defaults."  Torres, 2007 U.S. Dist. LEXIS 30517 (quoting Ramdeo v. Phillips, No. 04 Civ. 1157, 2006 U.S. Dist. LEXIS 7422 (E.D.N.Y. 2006).  In terms of procedural default, "cause" would mean that some factor external to the petitioner gave rise to the default.  Fernandez, 2006 WL 121943 at *5; Torres, No. 06 Civ. 785, 2007 U.S. Dist. LEXIS 30517.  Applied to the case before me, such a "good cause"

requirement would look for some reason, external to Petitioner, to explain Petitioner's delay in raising the issue of ineffective representation, from April 18, 2002, when Whitley's conviction was entered, to November 28, 2006, when Whitley filed his N.Y. C.P.L. § 440.10 motion in the New York Supreme Court.

Other district courts have held that a petitioner's showing of "reasonable confusion" constituted good cause for failure to exhaust his claims before filing in federal court. See Fernandez, supra; Brown v. Ebert, No. 05 Civ. 5579, 2006 U.S. Dist. LEXIS 29653 (S.D.N.Y. 2006); Rhines v. Weber, 408 F. Supp. 2d 844 (D.S.D. 2005) (on remand).  These district courts relied on Pace v. DiGuglielmo, 544 U.S. 408 (2005), decided one month after Rhines, in which the Supreme Court stated in dictum that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court."  544 U.S. 408, 416 (2005).  This more lenient manner of defining "good cause" would allow a petitioner to show the reasons, subjectively, for the delay in filing his petition.

Petitioner's motion to stay raises the issue whether his alleged "reasonable confusion" should suffice to find "good cause," or whether a stricter standard of "good cause," equivalent to excusing the independent state ground of procedural default, should be required.

## II.    Comity, Federalism, and the Procedural Default Doctrine

"The procedural default doctrine and its attendant 'cause and prejudice' standard are grounded in concerns of comity[5] and federalism." Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (brackets and internal quotations omitted).  To honor these concerns, a federal habeas court should not grant a petition if granting the petition would, in effect, overturn a state judgment that rests on independent and adequate state grounds, "unless the prisoner can

---

[5] Comity is "[c]ourtesy among political entities (as nations, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts."  BLACK'S LAW DICTIONARY 261 (7th ed. 1999).

demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  "Without the rule," the Coleman Court reasoned, "a federal district court would be able to do in habeas what [the Supreme Court] could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of [the Supreme Court's] jurisdiction and a means to undermine the State's interest in enforcing its laws."  Id. at 730–31.

The principle of comity—the courtesy of co-equal sovereigns—also guides the federal court when its jurisdiction is not in question, because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation …."  Rhines, 544 U.S. at 274. To avoid unseemly intrusion, the federal court "should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."  Id.

In the case before me, the principles of comity and federalism would favor deference to the "440.10" proceeding if there were a reasonable prospect that the New York State courts would find in Petitioner's favor that his representation was inadequate, and grant a new trial.  Before I examine that prospect of success, I should like to discuss in some greater detail the sufficiency of "reasonable confusion" as an excuse for the delay between April 18, 2002, when Whitley was sentenced, and November 28, 2006—four and one half years later—when he filed his "440.10" motion.

III.     <u>Pace v. DiGuglielmo</u> and "Good Cause"

   In <u>Pace</u>, the Supreme Court stated in dictum that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court."  544 U.S. at 416.  The Court's dictum responded to Pace's argument that "a petitioner trying in good faith to exhaust state remedies may litigate in state court for years only to find out at the end that he was never 'properly filed,' and thus that his federal habeas petition is time barred."  <u>Id.</u>  The Court suggested that a "prisoner seeking state postconviction relief might avoid this predicament … by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted."  <u>Id.</u>

   The <u>Pace</u> Court's dictum suggests that a petitioner's showing of reasonable confusion should satisfy the <u>Rhines</u> condition of good cause.  Two of the nine Justices who decided <u>Rhines</u>, Justices Stevens and Souter, said the same thing in their concurring opinions in <u>Rhines</u>.  Justice Stevens concurred in <u>Rhines</u> "on the understanding that its reference to good cause for failing to exhaust … is not intended to impose the sort of strict and inflexible requirement that would trap the unwary pro se prisoner," 544 U.S. at 279 (Stevens, J., concurring).  Justice Souter declined to join Justice O'Connor's majority opinion, but concurred in the judgment and issued a concurring opinion that proposed to drop altogether the "good cause" condition.  <u>See id.</u> (Souter, J., concurring).  And in the most recent Term, the Court further indicated that the option of granting a stay remains available to the district court to facilitate the operation of other procedures and to respect other principles.  <u>See</u> <u>Lawrence v. Florida</u>, 127 S. Ct. 1079, 1084 (2007) (holding that the district court may stay a federal habeas petition until the Supreme Court rules on a petition for certiorari from a state court decision); <u>Panetti v. Quarterman</u>, 127 S. Ct. 2842, 2854 (2007) ("[AEDPA's] purposes, and the practical

effects of our holdings, should be considered when interpreting AEDPA. This is particularly so when petitioners 'run the risk' under the proposed interpretation of 'forever losing their opportunity for any federal review of their unexhausted claims.'") (quoting <u>Rhines</u>, <u>supra</u>).

   For the foregoing reasons, I hold that a petitioner's showing of his confusion, if reasonable, concerning the delay in his state filing would satisfy the <u>Rhines</u> requirement of "good cause."

## IV. **Application of <u>Rhines</u> Standard**

A. <u>Good Cause</u>

   Petitioner, acting pro se, alleged in his timely petition for a writ of habeas corpus that the reading of Richardson's testimony at the first trial into the evidence of the second trial denied his constitutional rights to confront the witnesses against him, and to due process of law. His trial lawyer objected to the reading of Richardson's prior testimony, and asked for permission to cross-examine Richardson as to Richardson's recantation—his loss of memory of what he said at the first trial and what originally had occurred and said between him (Richardson) and Whitley.  Justice Drager denied the request, stating that Richardson had "nothing to testify about."  Pretrial Tr. at 199 (Jan. 9, 2002).  Petitioner reasonably could believe that all this was in issue in the habeas corpus proceedings before me.

   Soon after filing his habeas petition, petitioner filed a "440.10" motion in the New York Supreme Court, arguing that his trial counsel should have preserved his rights by objecting in additional respects regarding his inability to read Richardson's recantation into the evidence of the second trial, and that the failure to do so denied him the right to be represented by competent counsel.  The Appellate Division had ruled that there had been a procedural waiver in relation to the absence of foundational support for such reading—a ruling that it did not explain further except by citation to <u>Mattox v. United States</u>.  Petitioner sought to protect his federal

constitutional rights by making sure that there was no federal constitutional claim that he had

failed to exhaust (if he would not be able to win a new trial on the "440.10" ground of

incompetent representation).

       The substantive issues raised by the petition for a writ of habeas corpus appeared

to me to be of sufficient note to cause me to appoint counsel to represent petitioner.  Appointed

counsel then explained that Petitioner had not raised his "440.10" ground earlier because he was

"reasonably confused" as to his rights.  By affidavit in support of his explanation, Petitioner

avers that at the time he filed his federal habeas petition, he included his ineffective assistance of

counsel claim because he "was confused as to whether it would be considered timely and

whether [his] prior state submissions adequately exhausted [his ineffective assistance of counsel

claim] for federal review."  Whitley Aff. ¶ 3.  Before July 2007, when this Court appointed pro

bono counsel to represent Petitioner, he proceeded pro se.  There is nothing in the record to

suggest that his confusion was unreasonable, and much to suggest that it was.  See Rhines, 544

U.S. at 279 (Souter, J., concurring) ("[P]ro se petitioners … do not come well trained to address

… [the trickiness of some exhaustion determinations]."

       In Petitioner's case, the question whether counsel had failed to preserve the

recantation issue, and thus, was arguably ineffective, could easily cause confusion.  Petitioner's

counsel argued in the two-day pretrial proceedings before Justice Drager that he should have the

opportunity to cross-examine witness Glenn Richardson, but counsel's argument was rejected.

Nearly three years later, the Appellate Division ruled that Whitley's claim—that the trial court

erred by refusing to allow the defense to present the jury with evidence of Richardson's pretrial

testimony before Justice Goodman—was unpreserved.  But the Appellate Division also ruled on

the merits of the claim, a ruling that could have caused a layperson reasonably to believe that the

17

court had fully adjudicated Petitioner's claim on the merits. A trained lawyer easily could be confused by the Appellate Division's rulings, and be troubled by having to choose between state and federal court for the proper course of postconviction relief. I hold that Petitioner's confusion was reasonable, and that it constitutes "good cause" within the meaning of <u>Rhines v. Weber</u>.

    B.  <u>Potential Merit of Petitioner's Unexhausted Claim</u>

        Having reviewed the record and Petitioner's submissions, I conclude that Petitioner has shown that his unexhausted claim alleging ineffective assistance of counsel has potential merit. <u>See</u> <u>Rhines</u>, 544 U.S. at 277.

        The State's case against Whitley largely was based on Whitley's admissions, as presented by witnesses whose credibility was challenged, among them Glenn Richardson. The jury's assessment of the prosecution witnesses' credibility was of paramount importance. If the jury had been permitted to consider Richardson's recantation of the testimony he gave in the first trial, there is a "reasonable probability" that "the result of the proceeding would have been different." <u>Hemstreet v. Greiner</u>, 491 F.3d 84, 89 (2d Cir. 2007) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984)). And if Whitley's counsel could have moved to introduce the recantation evidence, but did not, counsel's performance may have been objectively unreasonable. <u>Cf.</u> <u>Quinones v. Miller</u>, No. 01 Civ. 10752, 2003 U.S. Dist. LEXIS 9176 at *158, n.71 (S.D.N.Y. 2003).

        If, indeed, trial counsel failed to preserve this important issue for appeal, the state court evaluating Petitioner's "440.10" motion may find an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Hemstreet</u>, 491 F.3d at 89. Or the "440.10" court might find that trial counsel sufficiently preserved the issue, and that the record before the Appellate Division when it affirmed Petitioner's conviction

was complete, with all material issues preserved. See Cotto v. Herbert, 331 F.3d at 238–47. The interests of comity strongly suggest that I stay my considerations of the habeas petition to permit review of these issues by the state court in which Petitioner's "440.10" motion is pending—the Appellate Division, First Department.

As to the third Rhines condition, there is no indication that Petitioner has "engaged in intentionally dilatory litigation tactics." Rhines, 544 U.S. at 278. Petitioner did not wait until after Respondent filed its motion to dismiss before seeking a stay, "which might be a sign of dilatory litigation practice." Fernandez, 2006 WL 121943 at *7. It is hard to imagine what incentive Petitioner, a non-capital prisoner, would have to delay the adjudication of his petition.

### Conclusion

For the reasons stated above, Respondent's motion to dismiss the petition is DENIED, and Petitioner's motion to stay the petition pending the New York court's resolution of Petitioner's N.Y. C.P.L. § 440.10 motion is GRANTED.

The briefing schedule created by order dated July 11, 2007, see Order to File Supplementary Memorandum and Oppositions (document no. 21, entered July 18, 2007), remains adjourned until further notice. Petitioner's counsel shall seek appointment as counsel for Petitioner in the Appellate Division, First Department, or assist Petitioner in obtaining counsel. Petitioner shall notify this Court every 90 days of progress in his state court proceedings and, in any event, within 30 days of any state court determinations.

SO ORDERED.

Dated:      September 19, 2007
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

19