UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                   :
DARRYL WHITLEY,                                                     :
                                                                   :
                               Petitioner,                         :     **ORDER AND OPINION**
                                                                   :     **GRANTING WRIT OF**
         -against-                                                 :     **HABEAS CORPUS**
                                                                   :
                                                                   :     06 Civ. 10198 (AKH)
ROBERT E. ERCOLE, Superintendent, Green Haven                      :
Correctional Facility,                                             :
                                                                   :
                               Respondent.                         :
                                                                   :
------------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

On November 2, 1981, Dr. John Chase Wood, a young doctor at Columbia

Presbyterian Hospital in Manhattan, was shot and killed as he walked to work.  Thirteen years

later, Darryl Whitley, the Petitioner, and Patrick McDowell were identified by jailhouse

informants as the killers of Dr. Wood.  Whitley and McDowell were tried separately in state

court, but each jury was unable to come to a unanimous verdict.  The two were retried, again in

separate trials.  At his second trial, McDowell, the alleged shooter, was found not guilty.

Petitioner, the alleged accomplice, was convicted.  On April 18, 2002, Whitley was sentenced to

a term of imprisonment of 22 years to life.

Whitley, having exhausted state procedures for relief from the judgment of

conviction, timely filed this petition for habeas review.  28 U.S.C. § 2254 (2006).  He alleges

violations of the Due Process and Confrontation Clauses of the United States Constitution.  The

issue I have to decide relates to the reading in Whitley's second trial of the testimony given by a

key jailhouse informant in Whitley's first trial, without letting the second jury know that the

informant claimed a lack of memory, sought to recant his prior testimony, and finally became
unavailable after having invoked the Fifth Amendment.

## I.    <u>BACKGROUND</u>

### a.  The Crime

On the evening of November 2, 1981, Dr. John Chase Wood, 31, was on call at
Columbia Presbyterian Hospital.  Wearing his scrubs and white lab coat and carrying his
stethoscope, Dr. Wood hurried home during his shift to comfort his pregnant wife.  On his return
to the hospital, while walking on Riverside Drive, two men accosted him, demanding
prescription drugs.  Dr. Wood said he had none.  The men patted his pockets, took out Dr.
Wood's prescription pad, and a scuffle broke out.  One assailant drew a handgun and fired twice,
fatally shooting Dr. Wood through his heart and left lung.

The assailants fled and Dr. Wood was taken to Columbia Presbyterian Hospital,
and died during surgery.  Detective Gennaro Giorgio of the New York City Police Department
was assigned to investigate the murder.

### b.  The Identification of McDowell and Whitley and Their Trials

Thirteen years later, in 1994, a jailhouse informant, Glenn Richardson, identified
Patrick McDowell as the shooter, and Petitioner, Darryl Whitley, as the accomplice.
Richardson's testimony was corroborated by other jailhouse informants.  On March 24, 1995, the
two were indicted and then tried separately.  Each trial resulted in a hung jury.

The men were retried, again in separate trials.  The State presented witnesses who
testified that the defendants made inculpatory statements.  Other witnesses testified that they
heard the gunshots and saw the perpetrators from a distance.  An eyewitness identified
McDowell as the shooter.  No witness to the event was able to identify Whitley.  McDowell was

acquitted.  The jury in Whitley's trial returned a guilty verdict for second degree murder.  On April 18, 2002, the Supreme Court sentenced Whitley to an indeterminate prison term of 22 years to life.

### i.   Testimony of Bernard Barnes

Bernard Barnes, a witness subpoenaed by the State, testified at Whitley's second trial that, during a visit to Whitley at Riker's Island in 1982, while Whitley was being detained in connection with an unrelated crime, Whitley stated that he was arrested for the robbery of a doctor and that, during the robbery, the doctor resisted, a gun was fired, and the doctor was killed.  The People argued that Barnes's attribution of his arrest to the robbery, at a time when the police did not know the identity of either suspect, and his recounting of the events of the robbery and murder, showed that Whitley was one of Dr. Wood's assailants.  On cross-examination, Barnes admitted that, when he told his story to Detective Gennaro Giorgio, he was facing a trial and heavy punishment for selling "crack" cocaine and that Detective Giorgio had offered substantial benefits by way of a reduced sentence if he cooperated and testified against Whitley and McDowell, and that he had been using drugs heavily when he told his story to Detective Giorgio.

### ii.   Testimony of Donald Caines

Donald Caines, another jailhouse informant, told Detective Giorgio in 1995 that ten years earlier, in 1985, while he and Whitley were housed at the Mt. McGregor Correctional Facility, Whitley admitted his involvement in Dr. Wood's murder.  Caines, elaborating to Giorgio, said also that Whitley stated that McDowell shot himself in the foot during the robbery, and that they had been arrested because the ballistics from McDowell's gunshot wound matched the ballistics evidence from Dr. Wood's murder scene.

In truth, McDowell had previously suffered a gunshot wound to his foot, and the bullet recovered from McDowell's foot did not match the .22 caliber bullet used to kill Dr. Wood.  Caines was impeached also by evidence that he previously had lied under oath, and by the substantial benefits that Caines had received from the People for his testimony, including cash payments in excess of $1,000.

### iii.   Testimony of Gregory Howard and Ricky Darlington

Gregory Howard, another jailhouse informant with an extensive criminal history, spoke to Detective Giorgio in 1995, while in jail for a parole violation.  Howard told Giorgio that police had questioned him about Dr. Wood's murder shortly after its occurrence, in November 1981, and that soon after, Howard spoke to Whitley about being questioned "for this doctor thing."  Whitley allegedly responded, "[W]hat'd they pick you up for?  It was me and [McDowell] down there, we did the doctor."  Howard gave this testimony in Whitley's trial, and testified that he and Whitley had had this conversation in the presence of Ricky Darlington, another long-term prisoner.

Howard testified that he was released from prison for his parole violation shortly after providing his statement to Detective Giorgio.  He also testified that Giorgio and an assistant district attorney assisted him in obtaining a dismissal of an outstanding warrant.  Darlington's testimony was to the same effect, as to both his direct testimony and the manner of his impeachment.

### iv.   Testimony of Detective Gennaro Giorgio

Detective Giorgio testified that he had been working on the Wood homicide since 1981, that he had interviewed Whitley in 1994 regarding the murder, and that he told Whitley that he and McDowell had been implicated in Dr. Wood's murder.  Giorgio then told the jury of

Whitley's response: "You don't have no case against [McDowell]. The only way you're going to get [McDowell] is through me." The People argued that Whitley's response constituted an admission of his involvement in the murder

### v.  Eyewitness Testimony

Four eyewitnesses who saw the crime being committed testified at Whitley's trial. Three testified that they saw the assailants, but that it was too dark to make out their faces. A fourth eyewitness, Dorothy Howze, was closest to the incident, and ran to Dr. Wood's aid after the shooting. As the assailants fled, Howze heard one say "Why did you do that?," to which the other responded, "I didn't mean to; it was an accident." In 1994, Howze was presented with a photo array that contained pictures of Whitley and McDowell. Howze testified that she was "maybe, ninety-percent" sure that McDowell was the shooter, but could not identify Whitley as the accomplice. Tr. Jan. 24, 2002, at 129 (Doc. No. 17).

### vi.  Testimony of Glenn Richardson

### 1.  Whitley's First Trial

At Whitley's first trial, Glenn Richardson testified that he, Whitley, and McDowell had grown up together and that he lent his .22 caliber revolver to McDowell in the fall of 1981. Richardson testified that Whitley told him, soon after Dr. Wood's murder, that he (Whitley) and McDowell were "on Riverside Drive, and they was looking for somebody to rob, and the doctor came along, and [Patrick] Raynard [McDowell] shot him." In fuller part, Richardson testified:

> [THE PEOPLE]: [In November of 1981], [w]ere you aware of an event of a doctor being killed?
> [RICHARDSON]: Yeah.
> [THE PEOPLE]: Okay, and just before that, did there come a time when Patrick Raynard McDowell asked you for something?
> [RICHARDSON]: Yeah, he had asked me for a gun.

[THE PEOPLE]:  And this was in the fall of 1981?

[RICHARDSON]:  Yeah, I guess so.[1]

. . .

[THE PEOPLE]: And when you, the gun that you gave to him, can you describe that?

[RICHARDSON]:  It's a .22; it's a small revolver.[2]

. . .

[THE PEOPLE]:  Mr. Richardson, after you heard about the events did you approach Patrick McDowell again, or did you approach him?

[RICHARDSON]:  Yeah, I seen him uptown.

[THE PEOPLE]:  This is on 159th Street?

[RICHARDSON]:  Yes.

[THE PEOPLE]: Can you describe that for us?

[RICHARDSON]:  I was walking uptown looking for him.  I seen him on 159th Street. And I asked him about the gun he had borrowed from me, and he said that he had used it, so he couldn't return it to me.

[THE PEOPLE]:  Did he use any particular phrase --

[RICHARDSON]: It was dirty.

[THE PEOPLE]: -- about the gun?

[RICHARDSON]:  Said the gun was dirty.

[THE PEOPLE]:  The gun was dirty.  What did that mean to you?

[RICHARDSON]:  That he had used it.

[THE PEOPLE]: Now, what did you do as a result of that conversation?  What did you do next?

[RICHARDSON]: I didn't believe him, I thought that he was just trying to get over on me.  I went down to see -- I went to 158th Street to see Darryl [Whitley], asked Darryl, did he know anything about what Raynard did with the gun.[3]

. . .

[THE PEOPLE]:  What did Darryl say?

[RICHARDSON]:  We talked for a while, then he -- I asked him about the gun, did he know if Raynard had my gun.  He told me, did I hear about the doctor? I didn't get it right away. Then he told me that -- he asked me, did I hear about the doctor being killed on Riverside Drive? I said, yeah.  Then he got silent after that.

[THE PEOPLE]:  Sorry, I missed that phrase.

[RICHARDSON]: He had got silent after that.

[THE PEOPLE]: He got silent?

[RICHARDSON]: Yeah, he told me in pig latin, he didn't have to do that.

[THE PEOPLE]:  He, is who? Who told?

[RICHARDSON]:  Darryl told me, in pig latin, that he didn't have to do it.

[THE PEOPLE]:  And when Darryl was speaking, did he use the word, he didn't have to do it?

[RICHARDSON]:  Yes.

[THE PEOPLE]:  And did he elaborate on what occurred there?

---

[1]   Tr. Jan. 24, 2002, at 203.

[2]   Id. at 205-06.

[3]   Id. at 207-08.

[RICHARDSON]: No.
[THE PEOPLE]: Did Darryl -- Now, did Darryl say anything about what happened on Riverside Drive?
[RICHARDSON]:  I think that he said that they was on Riverside Drive, and they was looking for somebody to rob, and the doctor came along, and Raynard shot him.
[THE PEOPLE]:   And when he related that, he used -- you used a plural pronoun?
[RICHARDSON]: What you mean?
[THE PEOPLE]: Well, you said that --
[RICHARDSON]: From the best of my recollection, he was telling me that they was walking.[4]
. . .
[THE PEOPLE]:  What did Darryl say about Riverside?
[RICHARDSON]: I think he said that they was walking on Riverside Drive, looking for somebody to rob, and the doctor came along.
[THE PEOPLE]: Did he say anything about what happened, at that point?
[RICHARDSON]:  I think that the doctor resisted, and Raynard shot him.
[THE PEOPLE]: Now as a result of that conversation, what did you do?
[RICHARDSON]: That was it, the conversation ended. I walked downtown.
[THE PEOPLE]:  Did you ever get the gun back?
[RICHARDSON]: No. I don't want nothing to do with the gun. I was kind of messed up about the situation . . . .[5]

Like all the witnesses who testified that Whitley had admitted his involvement in the Wood homicide, the cross-examination brought out that Richardson had an extensive criminal history and that his cooperation was procured by Detective Giorgio.  At the time Richardson agreed to cooperate, he was facing a prison sentence of twenty years to life for an unrelated federal drug charge.  As part of a plea bargain in the federal case, which led to a substantial reduction in his sentence, Richardson signed a cooperation agreement, obligating him to cooperate with federal, state, and local prosecutors.

Richardson was subjected to extensive cross-examination regarding his history of drug use, his drug distributions, his incentive to lie under oath, and the pressure he felt from Detective Giorgio to testify against McDowell and Whitley.

---

[4]     Id. at 209-10.
[5]     Id. at 210-11.

[WHITLEY'S COUNSEL]: . . . [E]ach and every time that you met with Detective Giorgio, you did you utmost to tell him the truth, right?

[RICHARDSON]:  From what I could remember, yes.

[WHITLEY'S COUNSEL]: That's because you know that it is very important that you tell the truth here, in a court of law.  Is that fair to say?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: You also know that when you are done serving the [federal] sentence, you are going to be [on supervised] release, right?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: And that if they; that is, the Federal Government, found out that you didn't live up to your bargain here, they can send you back for more jail, right?

[RICHARDSON]: No, I didn't know that.

[WHITLEY'S COUNSEL]: You don't want to do any more jail time, do you?

[RICHARDSON]:  No.

[WHITLEY'S COUNSEL]: You want to do as little as you possibly can right?

[RICHARDSON]: Exactly.[6]

. . .

[WHITLEY'S COUNSEL]: So you knew that your only hope of not serving 20 years or more in prison was to cooperate as much as you possibly could, right?

[RICHARDSON]: Yes.[7]

. . .

[WHITLEY'S COUNSEL]: And you also knew that the more information you gave [the Government], the more cooperation you gave [the Government], the better chance you had of getting a lower sentence, right?

[RICHARDSON]: Yes.[8]

. . .

[WHITLEY'S COUNSEL]: Isn't all [Whitley] really said to you, "Yo, between me and you, did you hear about the doctor being killed on Riverside Drive?" And then he said, in Pig Latin, "he didn't have to that," right?

[RICHARDSON]: Right, that's it.

[WHITLEY'S COUNSEL]: That's the only conversation you had with him, isn't it?

[RICHARDSON]: From memory, at that time.

[WHITLEY'S COUNSEL]: Yeah, from memory at that time, two years ago?

[RICHARDSON]: Right.[9]

. . .

[WHITLEY'S COUNSEL]: Now, I want to ask you some questions about when Detective Giorgio came and talked to you for the first time.  When he came and talked to you for the very first time, he told you that this was a high profile case, with a lot of press, right?

[RICHARDSON]: Yes.

---

[6]    Id. at 214.

[7]    Id. at 241.

[8]    Id.

[9]    Id. at 249.

[WHITLEY'S COUNSEL]:  He told you that this case involved the death of a doctor, just out of medical school, right?

[RICHARDSON]:  Yes.

[WHITLEY'S COUNSEL]: And he seemed very, very eager to solve this case, didn't he?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: You sensed that, from the very beginning, right?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: That this might be important, and if you cooperated on it, it could really help you out.  Isn't that what you thought.

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: And you told him, when he started to talk to you about this, "I want to help," right? Isn't that what you told him, "I want to help you"?

[RICHARDSON]: No, I didn't tell him that, initially.

[WHITLEY'S COUNSEL]:  No, when he asked you to tell him about this case, didn't you say, or didn't you think to yourself that after 13 years, you wouldn't be able to recall much on such short notice?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: Right?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: And you told him that, didn't you?

[RICHARDSON]: I told him that.

[WHITLEY'S COUNSEL]:  And didn't he say to you, "okay, the choice is up to you, but if you choose not to help, I'll inform that US Attorney Behe that you were uncooperative, and you'll lose any assistance made with the Government." Didn't he tell you that?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: And so then you are faced with the choice of giving him information on this case that he thought you had, or all of sudden being back up to facing 20 years to life, right?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: Now, it's fair to say, isn't it, that he asked you leading questions, right?

[RICHARDSON]: Such as, what? What do you mean by leading?

[WHITLEY'S COUNSEL]: Did you ever tell anyone that he asked you leading questions?

[RICHARDSON]: I don't remember.  Did I write it down? Did he ask me? [The witness was shown a document]

. . .

[WHITLEY'S COUNSEL]: Did you ever say that [Detective Giorgio] asked you leading questions?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]: Did you ever say that [Detective Giorgio] asked you pictorial questions?

[RICHARDSON]: Yes.

[WHITLEY'S COUNSEL]:  Did you ever say that your only choice was to listen to the questions, and any information he may give and stress your memory, to fit it in a place? Did you ever say that?

[RICHARDSON]:  Yes.[10]

…

[WHITLEY'S COUNSEL]:  You wouldn't lie, would you?

[RICHARDSON]:  No, I remembered to the best of my ability, at that time.[11]

. . .

[WHITLEY'S COUNSEL]:  And you were told by Detective Giorgio that if you didn't give him information, he would make sure that you got 20 years to life, right?

[RICHARDSON]:  Yes. Something to that effect, yeah.[12]

## 2.  Whitley's Second Trial

The second trial began 4 years and 2 months after Whitley's first jury was unable to come to a verdict and a mistrial was ordered.  By then, Richardson no longer was in jail. Before Whitley's second trial began, Richardson told the prosecutor that he was concerned about testifying against Whitley again, and about his memory of what Whitley had said to him.  The prosecutor raised these concerns with Justice Budd Goodman of the New York Supreme Court in an *ex parte* pre-trial proceeding held on November 26, 2001.  Justice Goodman assigned an attorney, Samuel Feldman, to represent Richardson, and conducted a hearing.  Tr. Jan. 8, 2002, at 103.  At the hearing, the following exchange took place:

THE COURT:  Mr. Richardson, do you know anything about the rules of order in this society, that when you are served with a subpoena and told to be here at a particular time that you can't wander in whenever you want? Do you understand that's contemptuous conduct, sir?

[RICHARDSON]: Yes.

. . .

THE COURT: In my court, if I tell you to be here at 9:30 in the morning and you are not here at 9:30 in the morning you will go to jail for contempt of court, regardless of what else you do.  Do we understand each other, sir?

[RICHARDSON]: Yes.

THE COURT: I don't take crap from anybody. Now, Mr. Richardson, do you remember on May 10th, 1994 that you made a statement?[13]

[RICHARDSON]: Yes, but I was not clear and conscious during that statement.

---

[10]   Id. at 252-55.

[11]   Id. at 256.

[12]   Id. at 263.

[13]   The May 10, 1994 statement refers to Richardson's statement to Detective Giorgio in which Richardson related statements allegedly made by Whitley.  See Tr. Jan. 8, 2002, at 79.

THE COURT: Read it. You know how to read, don't you? Read it.  (Off the record discussion between the witness and his counsel.)

THE COURT: Sir, have you had an opportunity to read that statement?

[RICHARDSON]: Yes, sir.

THE COURT:  Stand up, sir.  Raise your right hand.  Do you swear or affirm under penalties of perjury that the answers you are about to give to this court will be the truth and nothing but the truth?

[RICHARDSON]: Yes.

…

THE COURT: Now sir, did you get a chance to read that statement that you allegedly made . . . ?

[RICHARDSON]:  Yes, sir.

THE COURT: Is that your statement?

[RICHARDSON]: I don't remember.

THE COURT: You don't remember making this statement, sir?

[RICHARDSON]: Not totally, no.

THE COURT: Sir, you understand that if you suffer from amnesia, that that is what we call contemptuous conduct and that you could go to jail for a continuous period of time for a long time, not just for thirty days.

[RICHARDSON]: I understand that.

THE COURT: You understand that.

[RICHARDSON]: Yes, sir.

THE COURT: So you don't remember making this statement?

[RICHARDSON]: No.

THE COURT: You didn't make it?

[RICHARDSON]: I made it -- I might have made it the statement but I don't recall the whole content of the statement.

THE COURT: Well, when you made the statement, sir, was it true?  I'm not talking whether you remember it today.  Was what you said here true or did you lie?  That's a simple question, sir.  Answer it.

[RICHARDSON]:  If I don't remember it, how can I know if it's true or not, hopefully --

THE COURT [to the prosecutor]: Mr. Seidemann, what I suggest you do is the following --

[RICHARDSON]: It was true, that -- I don't remember it.

THE COURT: What I suggest at this time, obviously when he goes to trial, he is, and if he claims amnesia, you can instruct the trial judge to hold him in contempt of court. Right now it's not appropriate.  What I will do is I will direct him back here, I'll give him some time to think about this, since he's not working, we will see maybe he can jog his memory for the next few days.  We will have [him] come back here and if he doesn't show up on the date I ask, I will put him in because I am directing him to come back as a potential witness for the trial . . . .

THE COURT [to Richardson]: I suggest you try to see if you could jog your memory between now and [the next appearance]. Do you understand me, sir?

[RICHARDSON]: Yes, sir.[14]

---

[14]   Tr. Nov. 26, 2001, at 1-7 (Doc. No. 15).

Richardson then met with his court-appointed attorney, Samuel Feldman, to review his previous statements and prior testimony.  Tr. Jan. 8, 2002, at 105.  On January 8, 2002, Richardson, again represented by Mr. Feldman, appeared before Justice Laura Drager. Mr. Feldman informed Justice Drager that Richardson was not, as Justice Goodman characterized it, claiming "amnesia," and that Richardson intended to invoke his Fifth Amendment privilege if called to testify at Whitley's second trial.  Id. at 76; Tr. Jan. 9, 2002, at 167.  Justice Drager inquired of Feldman what Richardson's testimony at Whitley's first trial was, and how Feldman expected Richardson to testify if he were to take the stand at the second trial.  Tr. Jan. 8, 2002, at 107.  Feldman answered that Richardson would now testify that he could not "say for sure" that Whitley "specifically said" that he was with McDowell when McDowell allegedly shot Doctor Wood, or that Whitley ever said that McDowell "didn't have to shoot" Dr. Wood.  Id. at 108; Tr. Jan. 9, 2002, at 155.  Feldman also told Justice Drager that Richardson would again testify that he "felt pressure [from the prosecutor] to say that he was sure that Darryl [Whitley] had said to him that he was present and participated in the robbery, and witnessed the doctor being shot by [McDowell]."  Tr. Jan. 9, 2002, at 155.  Feldman added that Richardson had "never" been "sure" or "positive" of that account.  Id. at 106, 155.

Justice Drager asked the prosecutor what his position would be if Richardson's testimony was as his lawyer represented.  The prosecutor responded that Richardson "could be subject" to perjury charges, and that the People would not have to prove which version of Richardson's testimony—that which was presented at the first trial, or the second—was true.

The hearing before Justice Drager continued, and Richardson was called to the witness stand.  Richardson was asked whether, in November 1981, Whitley stated that he and McDowell had "robbed a doctor on Riverside Drive."  Id. at 165.  Richardson invoked the Fifth

Amendment and refused to answer the question.  Justice Drager held that Richardson was an unavailable witness and ruled that Richardson's prior trial testimony would be admitted.[15]

Whitley objected numerous times and requested that Richardson be granted immunity so that Whitley could explore the recantation.  Tr. Jan. 8, 2002, at 88, 119-120; Tr. Jan. 9, 2002, at 157-58, 162, 170-79, 192-99.  Justice Drager overruled the objection and ordered that Richardson's testimony be read into the record at Whitley's trial, without additional cross-examination and without any reference to the recantation.  Later, when Richardson's testimony was read to the jury, Justice Drager instructed the jury not to draw an adverse inference against Whitley from the fact that Richardson was not providing live testimony.[16]  Whitley did not object to the instruction.

Justice Drager, explaining her ruling of admissibility, found that Richardson had been cross-examined at Whitley's first trial about Richardson's claims of feeling coerced by Detective Giorgio, and that defense counsel easily could have extended Richardson's feeling of

---

[15]    The procedure followed by Justice Drager is customary in New York State.  N.Y. Crim. Proc. Law § 670.10 (Consol. 2010); People v. Stultz, 2 N.Y.3d 277, 286 (2004).

[16]    Justice Drager provided the following instruction:

Ladies and gentlemen, the testimony -- the evidence provided by Glenn Richardson is going to be provided through testimony that was given at a prior proceeding under oath at which the witness was subject to direct and cross-examination.

You are not to speculate on the reasons why this witness is not here testifying before you, but you are only to know that the court has determined that it is appropriate for you to hear this evidence in this way and that this is the manner in which this evidence is being received.

Of course, as with any other evidence, it is for you to determine how you will evaluate this evidence along with all of the other evidence presented in this case.

Tr. Jan. 24, 2002, at 182-83.

being coerced to statements by the assistant district attorney as well.  Tr. Jan. 9, 2002, at 186-87.

Justice Drager also noted that, as in <u>Bagby v. Kuhlman</u>, 932 F.2d 131, 136 (2d Cir. 1991), there

was "overwhelming reason" to doubt the "genuineness" of Richardson's recantation.  Tr. Jan. 9,

2002, at 187.  The court concluded that Richardson's recantation was motivated by his desire to

avoid testifying against a person whom he had known "for many years," and it was "unworthy of

belief."  <u>Id.</u> at 188-89.  Justice Drager found that Richardson's recantation contradicted prior

sworn statements and attributed the recantation, not to a loss of memory, but to the fact that

Richardson was no longer in jail and was no longer bound by his cooperation agreement.

Justice Drager noted the inconsistency also between Richardson's testimony[17] to

Justice Goodman in November 2001, in which Richardson claimed simply to have had no

"memory" of his statement to Detective Giorgio, and Feldman's representations in January 2002

that Richardson felt "coerced" by the assistant district attorney to testify that Whitley admitted

his involvement in the murder.  Justice Drager apparently assigned little weight to the

"inconsistency" in Richardson's recollection because, in admitting Richardson's prior testimony,

she stated that there was "no significant inconsistency" between Richardson's statements before

Justice Goodman and Mr. Feldman's representations before her.[18]  Tr. Jan. 9, 2002, at 196.

---

[17]    It is unclear whether Justice Drager was aware of the details of Richardson's testimony
before Justice Goodman.  Justice Drager incorrectly stated that Richardson's statements before
Justice Goodman were "not made under oath," Tr. Jan. 9, 2002, at 195, when in fact they were
under oath. Tr. Nov. 26, 2001, at 1-7.

[18]    Despite Justice Drager's finding that there was "no significant inconsistency" in
Richardson's recantation before Justice Goodman in November 2001 and Richardson's
recantation, through his attorney, in January 2002, the First Department apparently found
otherwise.  <u>See</u> <u>People v. Whitley</u>, 61 A.D.3d 423, 424 (1st Dep't 2009) ("[T]he recantation
statements were unclear and inconsistent" and Richardson "contradicted himself about whether
he lacked recollection of *making* a statement to a detective, of the *contents* of that statement, or
of the facts *underlying* the statement.").

14

Whitley's second trial began January 23, 2002, and concluded February 5, 2002. Richardson's testimony from the first trial, both his direct examination and his cross-examination, was read to the jury by members of the Manhattan District Attorney's office. During deliberations, in response to jury requests, Richardson's testimony twice was read back. The jury was told not to speculate or raise an adverse inference why Richardson did not appear before the jury in the second trial, and was not told of Richardson's efforts to recant the testimony that was read to the jury.

On February 6, 2002, the jury found Whitley guilty of murder in the second degree. On April 18, 2002, Justice Drager sentenced him to an indeterminate term of 22 years to life in jail.

## II.   APPELLATE HISTORY

On direct appeal, Whitley argued, *inter alia*, that the jury should have been made aware of Richardson's recantation. The First Department affirmed the conviction, holding that the contention was unpreserved. People v. Whitley, 14 A.D.3d 403, 405 (1st Dep't 2005); People v. Whitley, 4 N.Y.3d 892 (2005) (denying leave to appeal). The court noted that, although Whitley had objected to the admission of Richardson's prior testimony, he failed specifically to request that evidence of Richardson's recantation be admitted. Whitley, 14 A.D.3d at 405. In any event, the Appellate Division ruled, evidence of the recantation would have been inadmissible under New York law. Id. (citing Mattox v. United States, 156 U.S. 237, 244-50 (1895)) (requiring, as a condition of impeaching changed testimony, that the witness first be given an opportunity to explain the alleged infirmity in his prior testimony).[19] Furthermore,

---

[19]   Mattox provides, in relevant part:

the court ruled, the recantation was "highly suspect," and there was no "reasonable probability that its introduction would have affected the verdict."  Id.

Whitley next sought review from this Court by way of a habeas corpus proceeding, 28 U.S.C. § 2254, claiming that but for constitutional error, he would not have been convicted.  He also sought review by way of *coram nobis* proceeding in the New York Supreme Court, claiming that but for ineffective assistance of counsel, the testimony of Richardson would not have been admitted and the jury would not have convicted.  His petition for habeas corpus review was filed August 3, 2006; his motion pursuant to New York Criminal Procedure Law § 440.10, November 29, 2006.  In an opinion, I held that there was sufficient ground to support his constitutional claim, and that I should defer to Whitley's pending § 440.10 motion, allowing him first to exhaust his State grounds for relief, before considering his claims under the federal constitution.  Whitley v. Ercole, 509 F. Supp. 2d 410, 420-21 (S.D.N.Y. 2007).

On April 16, 2007, the New York Supreme Court denied Whitley's § 440.10 motion.  The court quoted extensively from the First Department's denial of Whitley's direct appeal, and adopted its conclusion that Whitley's claim was unpreserved.  Decision & Order, People v. Whitley, Ind. No. 2581/95, at *6 (N.Y. Sup. Ct. Apr. 16, 2007) (quotation omitted).  In the alternative, the court held that, if it were to review the merits, the claim would fail since,

---

> [B]efore a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements.  Justice to the witness himself requires not only that he should be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced.

156 U.S. at 245-46.

under New York law, Whitley would not be entitled to introduce Richardson's recantation at

trial.  Id. (citing Mattox, 156 U.S. at 244-50 (limiting the admissibility of recantation evidence)).

The court went on to adopt the First Department's conclusion that the "recantation was highly

suspect" and that there was "no reasonable possibility" that it would have changed the verdict.

Id.  The court concluded that Whitley's counsel could not have provided ineffective assistance

when he failed to request admission of Richardson's recantation since "there can be no

ineffectiveness for failing to seek introduction of evidence which was not only properly

excluded, but even if admitted, could not have affected the verdict."  Id. (quotation omitted).

　　　　　Whitley appealed the New York Supreme Court's ruling and the First Department

affirmed.  People v. Whitley, 61 A.D.3d 423 (1st Dep't 2009).  The First Department held that

Whitley's counsel was not ineffective for failing to move to introduce evidence of Richardson's

recantation because "[h]ad trial counsel attempted to get the statements before the jury, he would

undoubtedly have been rebuffed."  Id. at 423 (quoting People v. Stultz, 2 N.Y.3d 277, 287

(2004)).  The court then referred to its "alternative holding" in Whitley's direct appeal, that "the

recantation evidence was inadmissible" under New York law.  Id. (citing Mattox, 156 U.S. at

244-50).  Noting the inherent unreliability of recanted testimony, the court then held that "there

is overwhelming reason to question the statements' genuineness."  Id. at 424 (quoting Bagby,

932 F.2d at 136).  The court concluded by holding that, even if Whitley's counsel should have

sought admission of the recantation evidence, the error was not prejudicial since "[Whitley]

admitted his guilt to four persons on separate occasions" and "[t]he accounts of the four men

generally harmonized with each other . . . and there was no evidence of collusion."  Id. at 424

(quoting Whitley, 14 A.D.3d at 403).

### III.   STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that persons in state custody because of a state court conviction may petition for federal habeas corpus relief if their custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see, e.g., Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (noting "federal habeas corpus relief does not lie for errors of state law"); Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006).  The petitioner must show that the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1)-(2).  A decision is contrary to Supreme Court precedent if the state court "applies a rule that contradicts" that precedent, or reaches a different result on facts that are "materially indistinguishable."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable," and not simply erroneously or incorrectly decided.  Id. at 409, 411.

The state court's factual findings are presumed correct, unless the petitioner rebuts the presumption with clear and convincing evidence.  § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El, 537 U.S. at 340 (citing § 2254(d)(2)).

## IV.    DISCUSSION

At Whitley's first trial, the jury heard Richardson's "live" testimony and could not agree on a verdict.  At Whitley's second trial, Richardson's prior trial testimony was read to the jury, and this time the jury unanimously agreed and delivered a verdict that Whitley was guilty of Dr. Wood's murder.  All other evidence presented at the second trial was essentially the same as that presented at the first trial.  The jury did not hear that Richardson claimed not to remember that which he testified to at Whitley's first trial.

The issue that I have to decide is whether the omission of this fact from the jury's consideration was constitutional error.  I hold, as I discuss in the next several pages of this opinion, that this omission denied Whitley his constitutional rights to a fair trial and due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution.

### a.   The Trial Court Did Not Commit Constitutional Error by Admitting Richardson's Prior Trial Testimony and Refusing to Immunize Richardson

The first question is whether a witness's prior sworn testimony is admissible as evidence in a later trial if the witness becomes unavailable to testify at the later trial and if there was a full and fair opportunity to examine the witness at the prior trial.  Clearly, the answer is "yes," for there is a well-defined exception to the hearsay rule of inadmissibility for such prior testimony.  Fed. R. Evid. 804 (2010); N.Y. Crim. Proc. § 670.10 (Consol. 2010); People v. Stultz, 2 N.Y.3d 277, 286 (2004); People v. Savinon, 100 N.Y.2d 192, 198-99 (2003); Richard T. Farrell, Prince, Richardson on Evidence § 8-502 (11th ed. 1995).  And, clearly, a witness's claim of a Fifth Amendment privilege not to testify qualifies as an unavailability.  Stultz, 2 N.Y.3d at 286; Savinon, 100 N.Y.2d at 198-99; People v. Settles, 46 N.Y.2d 154, 167 (1978); Farrell, Prince, Richardson on Evidence § 8-503.

In the pretrial proceedings before Justice Drager, Richardson was called to the stand and asked whether he had had a conversation with Whitley in November 1981 in which Whitley admitted to robbing a doctor on Riverside Drive. Richardson invoked the Fifth Amendment and refused to answer the question. Consistent with New York law, Justice Drager held that Richardson was an unavailable witness and he was excused. See N.Y. Crim. Proc. Law § 670.10; Stultz, 2 N.Y.3d at 286; Savinon, 100 N.Y.2d at 198-99; see also United States v. Bahadar, 954 F.2d 821, 828 (2d Cir. 1992) (citing Fed. R. Evid. 804(a)(1)). If Richardson's testimony at Whitley's second trial was inconsistent with his testimony at Whitley's first trial, he would have been exposed to perjury charges, regardless of which version of his testimony was true. See N.Y. Penal Law § 210.20.

Whitley contends that the State procured Richardson's unavailability with the threat of perjury prosecution and by failing to immunize Richardson. Whitley relies on Barber v. Page for the proposition that, in some circumstances, a State's failure to produce a witness can violate a criminal defendant's right of confrontation. 390 U.S. 719, 724-25 (1968). In Barber, the State failed to produce a witness who was incarcerated in another state's prison, and the Supreme Court held that "the sole reason" why the witness was not present to testify was that the State "did not attempt to seek his presence." Id.

Here, unlike Barber, the State did not procure Richardson's unavailability. Though the prosecutor failed to execute a discretionary act—that is, it failed to request immunity for Richardson—the State's failure to immunize was not "the sole reason" for Richardson's unavailability. See id. Richardson was unavailable as a witness because he recanted his testimony and feared perjury charges. Unlike Barber, where the witness could testify only with

the State's cooperation, here, the witness, out of his own constitutionally-protected self-interest, elected not to testify. Thus, Barber is distinguishable.

Moreover, contrary to Whitley's characterization, the State did not threaten Richardson with perjury prosecution to procure Richardson's unavailability. Rather, on being asked by the court what would result if Richardson's testimony was contradictory on two separate occasions, each time under oath, the prosecutor answered:

> [THE PEOPLE]: He could be subject to penalties of perjury.
> THE COURT: You would proceed in that fashion?
> [THE PEOPLE]: Yes. And in fact . . . we wouldn't have to prove whether he lied now or then. We would have inconsistent perjuries since the trial of 1997. We would be within the statute of limitations.
> THE COURT: . . . Well, in light of what you are hearing, what is that you anticipate your client would do if he were called to testify?
> [RICHARDSON'S ATTORNEY]: Specifically about what we're talking about, he would take the Fifth.

Tr. Jan. 9, 2002, at 157 (Doc. No. 17).

A state court may grant immunity "when expressly requested by the district attorney to do so." N.Y. Crim. Proc. Law § 50.30. The prosecutor's discretion to request immunity for a witness is "quite broad" and "will not be deemed to have been abused unless, for example, the prosecutor builds his case with immunized witnesses but denies the defendant a similar opportunity." People v. Chin, 67 N.Y.2d 22, 32 (1986). The prosecution was not obligated to procure Richardson's testimony, United States v. Turkish, 623 F.2d 769, 774 (2d Cir. 1980); People v. Adams, 53 N.Y.2d 241, 247 (1981), and the State did not abuse its discretion in refusing to offer immunity. See Chin, 67 N.Y.2d at 32.

Whitley fails to establish that the trial court's decision on this issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision

that was based on an unreasonable determination of the facts."  § 2254(d)(1)-(2).  However, that the State did not procure Richardson's unavailability does not resolve the question whether evidence of Richardson's recantation should have been made known to the jury.

### b. The State Trial Court's Credibility Determination Was Based on an Unreasonable Factual Determination

Though "[c]redibility is best determined by the trier of fact," People v. Batista, 235 A.D.2d 631, 632 (3d Dep't 1997) (quoting People v Shedrick 104 A.D.2d 263, 274 (4th Dep't 1984), aff'd 66 N.Y.2d 1015 (1985)), a trial judge has the authority to keep from the jury testimony that is incredible as a matter of law.  See Fiddler v. N.Y. Cent. & Hudson R.R. Co., 64 A.D. 95, 100 (N.Y. App. Div. 1901).  Testimony is incredible as a matter of law if it is "manifestly untrue, physically impossible, contrary to experience, or self-contradictory." Batista, 235 A.D.2d at 632 (quoting People v Stroman, 83 A.D.2d 370, 373 (1st Dep't 1981)). Mere inconsistencies in a witness's testimony will not render that testimony incredible as a matter of law.  People v. Moore, 17 A.D.3d 786, 789 (3d Dep't 2005) (finding that testimony "was at times contradictory and inconsistent with . . . prior statements," the court declined to find it incredible as a matter of law); People v. Palmer, 214 A.D.2d 479, 479 (1st Dep't 1995) ("While there were some inconsistencies between the identification witness'[s] original description of defendant and his testimony at trial, these inconsistencies did not render his testimony incredible as a matter of law, but presented a question of fact for the jury to determine . . . ."); People v. Cotto, 189 A.D.2d 707, 707 (1st Dep't 1993) ("Nor is there merit to defendant's contention that the officers' inconsistent testimony rendered their testimony incredible as a matter of law. These inconsistencies were for the jury to resolve.") (citing People v. Mosley, 112 A.D.2d 812 (1st Dep't 1985)).

I hold that the trial court's determination that Richardson's professed inability to recall whether Whitley previously implicated himself and McDowell in Dr. Wood's murder was not admissible because it was incredible as a matter of law, was "based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2).[20] In preparing for the second trial, the Assistant District Attorney found Richardson evasive concerning the statements he had made to Detective Giorgio nearly a decade earlier, concerning events that took place nearly two decades earlier. The ADA considered that Richardson was unwilling to testify, not because of imperfection of memory, but because he was no longer in jail, no longer had a need to cooperate, and did not want to testify against a friend, particularly one who could cause him harm, and the ADA brought Richardson before Justice Goodman. Under oath, Richardson testified that he did not remember making a statement to Detective Giorgio in 1994. Tr. Nov. 26, 2001, at 4 (Doc. No. 15). Justice Goodman, after warning Richardson that he does not "take any crap from anybody" and stating that Richardson "could go to jail for a continuous period of time for a long time" if he "suffered from amnesia," directed the prosecutor to seek contempt charges if Richardson could not recall his prior statement. Tr. Nov. 26, 2001, at 2-7. Justice Goodman stated that Richardson was "not working" and gave him "some time to think" about his testimony and to "jog his memory." Id. Over the course of the next several weeks, Richardson met with his court-appointed attorney and extensively reviewed his prior testimony and statements.

Subsequently, Richardson and his attorney appeared before Justice Laura Drager before the second trial of Whitley was to begin. Richardson's attorney represented that

---

[20]     Justice Drager found "[Richardson's] renounced recantation to be unworthy of belief and motivated by [his] desire to avoid having his words used against a person whom he has known for some period of time, for many years." Tr. Jan. 9, 2002, at 189.

Richardson "wasn't sure" that Whitley ever stated "that he was present and participated in the robbery of the doctor," and that Richardson had felt "pressure, indirectly" from the prosecutor to testify at Whitley's first trial that he was sure that Whitley had made such statements.  Tr. Jan. 8, 2002, at 77, 108; Tr. Jan. 9, 2002, at 155.

Justice Drager put Richardson under oath, and the ADA asked if he could identify Whitley, and if Whitley had implicated himself in the homicide.  Tr. Jan. 9, 2002, at 165. Richardson answered the first question and then invoked the Fifth Amendment, refusing to answer the question whether Whitley had implicated himself.  Id. at 165-66.

Justice Drager's determination, that Richardson had recanted his former testimony, and that Richardson's recantation was incredible as a matter of law followed.  That determination, however, is accorded less deference than usual, for it was based on representations of an attorney, little opportunity to observe demeanor, and on a "paper record" of Richardson's prior testimony.  See Mendiola v. Schomig, 224 F.3d 589, 597-98 & n.4 (7th Cir. 2000) (Rover, J., dissenting) (trial judge's determination that a material witness's "recantation" was incredible as a matter of law, could not be based on a "paper record" and an attorney's representations).

Once Richardson invoked the Fifth Amendment's protections, Justice Drager correctly held that he was an unavailable witness.  N.Y. Crim. Proc. Law § 670.10; Stultz, 2 N.Y.3d at 286; Savinon, 100 N.Y.2d at 198-99.  As an unavailable witness, Richardson's prior trial testimony could be admitted.  However, Justice Drager's view, that Richardson's recantation was "unworthy of belief," and that Richardson's prior testimony could be admitted without reference to the recantation, created a basic unfairness in the mix of evidence before the jury and compromised the Confrontation Clause of the Sixth Amendment.

It is unclear whether Justice Drager appreciated the nature of Richardson's testimony before Justice Goodman.  In discussing whether the admission of Richardson's prior testimony would violate Whitley's right of confrontation, the following exchange took place:

> [WHITLEY'S ATTORNEY]:  . . . There is now a new issue regarding Whitley's credibility, and regarding the credibility of the transcripts which [the State] is attempting to introduce at this trial, regarding what Mr. Richardson said on whatever date it was, to [Justice] Goodman, about his inability to remember the statements made, inculpatory statements.
> THE COURT:  I don't understand that, at all.  When he spoke, a statement is made to Justice Goodman.  It's not under oath.  It's not made in any respect, it is simply made. He is making this statement that he doesn't remember.

Tr. Jan. 9, 2002, at 195.  Justice Drager's observation, that Richardson's "statement" to Justice Goodman was "not under oath," is incorrect.  Tr. Nov. 26, 2001, at 3.

In November 2001, Richardson testified under oath that he could not recall a conversation he had had with Detective Giorgio in 1994, concerning statements Whitley allegedly made in 1981.  Id. at 3-6.  Richardson, with the help of his attorney and at Justice Goodman's direction, reviewed his testimony from Whitley's first trial and his statements given in 1994, and when he appeared before Justice Drager in January 2002, he represented, through his attorney, that he had never been sure that Whitley ever made any incriminating statements.

The sequence of events has sufficient plausibility to have been put to the jury at Whitley's second trial.  The testimony cannot be said to be "manifestly untrue" or "self-contradictory," see Batista, 235 A.D.2d at 632, even with its inconsistencies and potentially corrupt motivations.  The State's argument, that Richardson's prior testimony was replete with inconsistencies, potentially corrupt motivations, and questionable credibility, is a valid argument. But one cannot overlook that Richardson was unwilling to repeat it, whether because of imperfect memory or because he no longer had a need to ingratiate himself as a cooperator.  Who can know the insides of Richardson's tortured mind?  What remains is that I cannot dismiss that

material nature of the missing fact that was kept from Whitley's second jury, that Richardson, a key witness, no longer was willing, or able, to testify as he had in the first trial.

> **c.   Whitley's Rights to Due Process and to Confront Adverse Witnesses Were Violated When the Trial Court Admitted Richardson's Testimony Without Evidence of His Recantation**

The admission of Richardson's prior trial testimony without evidence of his recantation deprived Whitley of a fair trial and of his right to confront adverse witnesses.

At Whitley's first trial, in 1997, Richardson testified that Whitley admitted his involvement in the murder by stating that he and McDowell were "on Riverside Drive, and . . . looking for somebody to rob when [Doctor Wood] came along."  Trial Tr. Jan. 24, 2002, at 207-08.  Richardson testified also that Whitley said "the doctor resisted, and [McDowell] shot him," and that only through Whitley's testimony could McDowell be convicted.  However, by 2002, Richardson no longer stood by that testimony, at least to say that he no longer remembered his conversations with Whitley and McDowell.  Richardson stated that he had been pressured by an assistant district attorney to testify, and he refused to testify at Whitley's second trial.

Was the court's decision to admit Richardson's prior testimony an unreasonable application of Supreme Court precedent?  If Richardson's testimony of recantation was incredible as a matter of law, should that not have affected all his testimony, making all of it incredible as a matter of law?  Even if it did not taint all of his testimony, should not the jury have been presented with the total mix of information bearing on the believability of the State's most important witness, particularly in a case so heavily dependent on the credibility of the State's witnesses?

### i.  Whitley Did Not Receive a Fair Trial

"The right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment, imposes on States certain duties consistent with their sovereign obligation to ensure that justice shall be done in all criminal prosecutions."  Cone v. Bell, 129 S.Ct. 1769, 1772 (2009) (internal quotation omitted).  Although the Due Process Clause guarantees a fair trial, "it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment," including the Confrontation Clause.  United States v. Gonzalez-Lopez, 548 U.S. 140, 146 (2006) (quoting Strickland v. Washington, 466 U.S. 668, 684-85 (1984)).  A criminal defendant's right to confront and cross-examine adverse witnesses "helps assure the accuracy of the truth-determining process."  Chambers v. Mississippi, 410 U.S. 284, 295 (1973) (internal quotation omitted).  The "right[ ] to confront and cross-examine witnesses . . . [has] long been recognized as essential to due process."  Id. at 294.

In Chambers, the Supreme Court explained that the "denial or significant diminution" of a criminal defendant's right to confront and cross-examine adverse witnesses "calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined."  Id. at 295 (internal quotation omitted).  In Chambers, the state criminal defendant was prevented from cross-examining a witness on the basis of a state common-law evidentiary rule preventing parties from impeaching their own witnesses.  Id.  On four separate occasions, the witness confessed to the crime with which Chambers was accused, yet Mississippi's common-law rule prevented Chambers from exploring those statements.  Id. at 297.  The Court concluded that the state evidentiary rule "plainly interfered with Chambers' right to defend against the State's charges" and the rule "deprived Chambers of a fair trial."  Id. at 298.

In Ramchair v. Conway, the Second Circuit reaffirmed the importance of a criminal defendant's right to confront and cross examine witnesses and to call witnesses on one's behalf.  601 F.3d 66 (2d Cir. 2010).  The prosecutor elicited testimony establishing that the defendant's attorney was present for, but failed to object to, a corporeal lineup in which the defendant was identified.  Id. at 73-74.  The lineup was the sole basis for the defendant's identification as the perpetrator of the crime of which he was charged.  Id.  The defendant's attorney requested and was denied permission to testify in rebuttal.  Id. at 68.  The court denied the application, and the defendant was eventually convicted.  Id. The defendant petitioned for a writ of habeas corpus, and the district court granted the petition.  The Second Circuit affirmed, holding that "[t]he clear implication" of denying defendant the right to rebut the testimony of the prosecution's witness was that the defendant's attorney "conceded that the lineup was fair."  Id. at 70.  The Second Circuit concluded that the defendant "was thus deprived of his right to a fair trial."  Id. at 74.

I hold that the ruling of the state trial court admitting Richardson's prior trial testimony without evidence of his recantation, or alleged failure or unwillingness to remember, denied Whitley a fair trial and "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Richardson's testimony was admitted over Whitley's objection.  Whitley sought to cross-examine Richardson—that is, he sought testimonial evidence regarding his recantation, or inability or unwillingness to remember.  The trial court denied that application, and the jury received Richardson's prior trial testimony

without any evidence to qualify or limit it.[21]  The "clear implication" of admitting Richardson's

prior trial testimony without any evidence of his unwillingness to stand by it is to give it an

additional quantum of weight.  Ramchair, 601 F.3d at 73.  The court's ruling fundamentally

compromised the "accuracy of the truth-determining process," and this violated Whitley's clearly

established Fourteenth Amendment right to a fair trial.  Chambers, 410 U.S. at 295 (citing

Dutton v. Evans, 400 U.S. 74, 89 (1970); see also Ramchair, 601 F.3d at 73-74.

### ii.  Whitley Was Denied the Right to Confront an Adverse Witness

I consider also the implications of Richardson's unavailability with respect to the

Confrontation Clause of the U.S. Constitution.  It is, of course, basic that a defendant in a

criminal case has a constitutional right to confront witnesses against him through cross-

examination.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the

right . . . to be confronted with the witnesses against him . . . .");  Davis v Alaska, 415 U.S. 308,

315-16 (1974).  As the Supreme Court has observed, "[c]ross-examination is the principal means

by which the believability of a witness and the truth of his testimony are tested."  Davis, 415

U.S. at 316.  In addition to requiring the witness's physical presence before the defendant,

Maryland v. Craig, 497 U.S. 836, 846 (1990); United States v. Ajmal, 67 F.3d 12, 16 (2d Cir.

1995), the Confrontation Clause also "(1) insures that the witness will give his statements under

oath—thus impressing him with the seriousness of the matter and guarding against the lie by the

---

[21]  In a civil case, an adverse inference can be drawn against a party to an action who refuses invokes the Fifth Amendment, Baxter v. Palmigiano, 425 U.S. 308, 318 (1976), and in some circumstances, against a party when a nonparty witness's invocation of the Fifth Amendment results in a failure of proof.  Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir. 1983).

Of course, a defendant in a criminal case is not required to be a witness, and his invocation of the Fifth Amendment cannot be the subject of inquiry or comment.  U.S. Const. amend. V; Baxter, 425 U.S. at 318.  I am not familiar with any Supreme Court precedent establishing that a defendant in a criminal case can comment if a witness against him claims the Fifth Amendment.

possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."  California v. Green, 399 U.S. 149, 158 (1970) (internal quotation omitted).  However, the Sixth Amendment's guarantees are not unbounded.  Criminal defendants are guaranteed an "opportunity" to conduct an effective cross-examination, "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (citing Delaware v. Fensterer, 474 U.S. 15, 20 (1985)).

The issues presented in Whitley's petition for habeas corpus differ from mine-run confrontation claims, such as where a witness refuses to answer certain questions during his trial testimony, or recants during the course of the trial.  See, e.g., United States v. McGlory, 968 F.2d 309, 344 (2d Cir. 1992); Bagby, 932 F.2d at 133; Klein v. Harris, 667 F.2d 274, 279 (2d Cir. 1981); United States v. Cardillo, 316 F.2d 606, 610 (2d Cir. 1963).  Here, after testifying at Whitley's first trial, in 1997, and being subjected to extensive cross-examination, Richardson recanted in the weeks leading up to Whitley's second trial, in 2002.

When Richardson invoked the Fifth Amendment, Whitley was deprived of an adequate opportunity to cross-examine on Richardson's recantation, and was denied the opportunity to present the jury with the information needed to appropriately weigh the "accuracy and truthfulness" of Richardson's testimony.  Davis, 415 U.S. at 317-18; Bagby, 932 F.2d at 135 (witness's invocation of the Fifth Amendment violates defendant's Sixth Amendment rights "only when assertion of the privilege undermines the defendant's opportunity to test the truth of the witness'[s] direct testimony").  Knowledge of the recantation was the only avenue by which

the jury could "make an informed judgment as to the weight to place on [Richardson's] testimony which provided a crucial link in the proof . . . of [Whitley's] act." Davis, 415 U.S. at 317 (internal quotation omitted).

The State correctly notes that Richardson was subjected to extensive cross-examination at Whitley's first trial.  Whitley cross-examined Richardson about his recollection of the alleged inculpatory statements, pressure he may have felt from Detective Giorgio to implicate Whitley, Richardson's criminal history, and his incentive to "cooperate" with the Government in order to curry favor and receive a reduced sentence for his own criminal acts.  All of these questions, and their answers, were presented to the jury at Whitley's second trial.  Yet the State misses the importance of Richardson's recantation, its impact on the total mix of information that should have been presented to the jury, the jury's ability appropriately to weigh Richardson's testimony, and the overall importance of Richardson's testimony to the State's case against Whitley.  See United States v. Abel, 469 U.S. 45, 52 (1984) ("[T]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness'[s] testimony.").

The trial court's admission of Richardson's testimony without this necessary qualification was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent guaranteeing an adequate opportunity to cross-examine a witness on all material facts presented by that witness.  28 U.S.C. § 2254(d)(1); Crawford v. Washington, 541 U.S. 36,  57 (2004) ("[P]rior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine."); United States v. Owens, 484 U.S. 554, 557 (1988) (Confrontation Clause "has long been read as securing an adequate opportunity to cross-examine adverse witnesses"); Van Arsdall, 475 U.S. at 680 ("[D]efendant states a

violation of the Confrontation Clause by showing that he was prohibited from engaging in

otherwise appropriate cross-examination designed to . . . expose to the jury the facts from which

jurors . . . could appropriately draw inferences relating to the reliability of the witness.") (internal

quotation omitted).  The admission of the prior trial testimony without additional cross-

examination, or other evidence of Richardson's recantation, conflicts with the core objective of

the Confrontation Clause.  Craig, 497 U.S. at 845 ("The central concern of the Confrontation

Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to

rigorous testing in the context of an adversary proceeding before the trier of fact."); see also

Kittelson v. Dretke, 426 F.3d 306, 320-21, 323 (5th Cir. 2005) (granting habeas petition because

defendant's right to confront adverse witnesses was violated when trial court precluded cross-

examination or other evidence that left the jury with an impression that two children accused

defendant of molestation, when in fact one child recanted the accusation); Cotto v. Herbert, 331

F.3d 217, 248-49 (2d Cir. 2003) (granting habeas petition where state court's decision to prevent

defendant from cross-examining key adverse witness found to be "objectively unreasonable");

LaFevers v. Gibson, 182 F.3d 705, 715 (10th Cir. 1999) (a "principal prosecution witness" was

extensively cross-examined at petitioner's first trial, and that testimony was admitted at

petitioner's second trial even though witness recanted his testimony; the court found that

constitutional error was "arguably averted . . . [or]made . . . harmless" since petitioner was able

to put to the jury evidence of the recantation).

It is true, as the State argues, that Richardson's prior testimony presented the jury

with full and fair direct, cross-examination and impeachment evidence as of the first trial.  But

the jury was not presented with Richardson's professed failure to recall whether Whitley made

incriminating statements in 1981.  By the time of Whitley's second trial, Richardson was out of

jail and was no longer bound by the terms of the federal cooperation agreement.  He lacked a sanction to remember and give testimony and now he professed not to remember incriminating statements Whitley allegedly made to him.  The jury should have been able to hear and observe Richardson's current state of mind and the changed context relevant to his testimony. Introducing Richardson's prior testimony, without presenting the current context of that testimony, violated Whitley's right to be confronted with the witnesses against him.

The record establishes that Whitley sought that confrontation and, when Richardson invoked his Fifth Amendment privilege, Whitley asked the State to immunize Richardson from charges of perjury for his prior or current testimony.  Normally, a defendant cannot compel the prosecution to immunize a witness whom defendant proposes to call, N.Y. Crim. Proc. Law § 50.30; People v. Adams, 53 N.Y.2d 241, 247 (1981); People v. Shapiro, 50 N.Y.2d 747, 760 (1980), but that disability does not apply when the prosecution's reluctance enables the prosecution to present evidence in a false light.  See United States v. Dolah, 245 F.3d 98, 105 (2d Cir. 2001).  Granting immunity to Richardson, to enable Whitley to call him as a witness, would have given the jury a full and fair story.  The trial court's constitutional error was compounded, or not remedied, by its failure in the circumstances to require the immunization of Richardson that the defense requested.

It is true, also, as the State argues, that recantation evidence is distrusted, and the court has inherent power to exclude clearly incredible evidence so that it is not heard by the jury. But Richardson's professed lack of recollection of statements that he had recalled 4 years and 2 months earlier is not quite recantation, and in the circumstances of this case, was not inherently incredible.  Richardson's professed lack of recollection, even if represented by his attorney and not in his own words, could have been given to the jury by stipulation, testimony, or instruction.

Furthermore, the trial court's belief that, under <u>Mattox v. United States</u>, 156 U.S. 237, 244-46 (1895), state evidentiary law compelled exclusion of Richardson's recantation does not bar this Court's review of whether admitting Richardson's prior trial testimony violated Whitley's constitutional right to a fair trial or his right to confront adverse witnesses.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>Rosario v. Kuhlman</u>, 839 F.2d 918, 927 (2d Cir. 1988).[22]

The jury considered Richardson an important witness.  Twice, the jury in its deliberations asked that Richardson's testimony from the first trial be re-read to it, and twice more it was re-read.  Had the jury known that Richardson could no longer remember, now that he was free of jail, that which he remembered when he wanted to be released from a long jail term, or that he now claimed that he had "never" been "sure" or "positive" of his previous account, or that he now refused to testify for fear of perjury charges, the jury's impression of Richardson's credibility likely would have been affected.

### iii.   The State Court's Error Was Not Harmless

The State has the burden of establishing that the error of admitting Richardson's prior trial testimony without evidence of his recantation was harmless.  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995).  Under <u>Brecht v. Abrahamson</u>, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.  507 U.S. 619, 631

---

[22]    Federal courts no longer follow <u>Mattox</u>.  <u>See</u> Fed. R. Evid. 806.  As a matter of New York State law, the New York Court of Appeals has recognized the danger of a rigid application of <u>Mattox</u>'s foundational requirement.  <u>People v. Bosier</u>, 6 N.Y.3d 523 (2006).  In <u>Bosier</u>, the Court of Appeals explained that a criminal defendant's right to a fair trial requires that defendants have the opportunity to impeach an unavailable witness with prior inconsistent statements, otherwise "the jury will be misled into giving too much weight to the statement offered by the prosecution."  <u>Id.</u> at 528; <u>see also</u> Richard Farrell, <u>Prince, Richardson on Evidence</u> § 8-111 (11th ed. 1995) ("excessively technical requirement" of laying a foundation to impeach a witness with that witness's prior inconsistent statements "may raise a serious due process question" if it "exclude[s] evidence that seriously undermines that credibility of the prosecution's evidence").

(1993).  The Supreme Court has instructed courts to consider several factors when assessing

harmlessness: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct

with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted

testimony; and (4) whether such evidence was cumulative of other properly admitted evidence."

United States v. Lombardozzi, 491 F.3d 61, 76 (2d Cir. 2007) (collecting cases).  If, after

considering these factors, the federal judge reviewing the habeas petition is in "grave doubt"

about whether the error was harmless, meaning that, "in the judge's mind, the matter is so evenly

balanced that he feels himself in virtual equipoise as to the harmlessness of the error[,] . . . the

uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict."

O'Neal, 513 U.S. at 435.

   The State's case against Whitley was weak, reflected by the record of hung juries

against Whitley and McDowell, and the acquittal of McDowell in his second trial.  There was no

physical evidence tying Whitley to the crime.  While one eyewitness was "maybe, ninety

percent" sure that McDowell as the shooter, none of the four eyewitnesses could identify

Whitley as the accomplice.  Tr. Jan. 24, 2002, at 129.  The State's case against Whitley relied

heavily on the testimony of four jailhouse informants, all of whom had extensive criminal

histories and received substantial benefits for their testimony against Whitley.  Richardson's

testimony was the State's most important evidence implicating Whitley and was not cumulative

of any other evidence presented.  Richardson was the only witness who testified to having

conversations with McDowell and Whitley in which both individuals allegedly made

incriminating statements.  Richardson was also the only witness who could place the suspected

murder weapon in McDowell's possession.

Though Richardson was the most important of the State's witnesses, it cannot be known whether the jury would have convicted Whitley without Richardson's testimony, or with Richardson's testimony and evidence of his recantation.   I am left in, at least, "virtual equipoise as to the harmlessness of the error." Ruiz v. Kuhlmann, No. 97 Civ. 6620 (FB), 2001 U.S. Dist. LEXIS 6920, at *25 (E.D.N.Y. May 30, 2001) (quoting O'Neal, 513 U.S. at 435).   Accordingly, the State has failed to carry its burden of showing harmlessness, and I must treat the error as if it "had a substantial or injurious effect or influence in determining the jury's verdict." O'Neal, 513 U.S. at 435; see also Fry v. Pliler, 551 U.S. 112, 116 (2007) (quoting Brecht, 507 U.S. at 631).

### d.   Whitley Did Not Procedurally Forfeit his Right to Challenge Richardson's Testimony

It is well-established that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." Picard v. Connor, 404 U.S. 270, 275 (1971).  A habeas petitioner is not entitled to relief where the state court judgment rests on a state law ground that is adequate to support the judgment and independent of the federal question.  Lee v. Kemna, 534 U.S. 362, 375 (2002); Garcia v. Lewis, 188 F.3d 71, 76-78 (2d Cir. 1999).  To constitute an adequate and independent ground that bars habeas review, the rule must be a "firmly established and regularly followed state practice" in the specific circumstances of the case presented.  James v. Kentucky, 466 U.S. 341, 348 (1984).

This rule applies regardless of whether the state law ground is substantive or procedural.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  However, "[t]he doctrine of procedural default is based on considerations of comity and finality, and not a jurisdictional limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation." Spence v. Super., Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000);

36

see Lambrix v. Singletary, 520 U.S. 518, 522-23 (1997); Coleman, 501 U.S. at 730.  A federal

habeas court should not grant a petition if doing so would, in effect, overturn a state judgment

that rests on independent and adequate state grounds, "unless the prisoner can demonstrate cause

for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will result in a fundamental miscarriage of

justice."  Coleman, 501 U.S. at 750.  A habeas petitioner may procedurally forfeit an otherwise

meritorious claim if he fails to comply with a state rule requiring his timely objection to an

asserted error at the trial level.  Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977); Glenn v.

Bartlett, 98 F.3d 721, 724 (2d Cir. 1996).

Here, the State argues that Whitley's habeas petition must fail because he did not

comply with New York's rule requiring that parties seek a ruling "when the court has an

opportunity" to effectively implement that ruling.  N.Y. Crim. Proc. Law § 470.05(2); Whitley,

14 A.D.3d at 405.  The State's argument lacks merit.  It is clear from the record and the cases

that the State's notion of an adequate state ground of procedural default is not an "adequate"

ground, and not based on the record of this case.

A procedural rule is adequate to preclude federal habeas review "only if it is

based on a rule that is firmly established and regularly followed by the state in question" in the

specific circumstances presented.  See Cotto, 331 F.3d at 239-40 (quoting Garcia, 188 F.3d at

77).  The Supreme Court has explained that the adequacy of a state procedural bar is determined

by considering the "particular application" of the rule.  Lee, 534 U.S. at 387.

In Lee, the defendant, on trial for murder in Missouri state court, relied on an alibi

defense.  To establish his defense, his mother, step-father, and sister were subpoenaed and

scheduled to testify on the last day of the trial.  However, when the defendant called them as

witnesses, none could be found in the courthouse.  Defense counsel requested an adjournment, and the trial judge, citing personal reasons and a conflict with a previously-scheduled trial, declined the request for a continuance.  The trial ended that afternoon, the jury deliberated for three hours, and the defendant was found guilty on all counts.  The trial court denied Lee's motion for a mistrial.  On appeal, the Missouri Court of Appeals affirmed the convictions, holding that the motion for a continuance was made orally and therefore did not comply with a state procedural rule requiring that such motions be made in written form and be accompanied by an affidavit that contains sufficient factual showings.

On habeas review, the Supreme Court held that the state procedural rule was not an adequate bar to federal habeas review and articulated three considerations to guide courts in determining the "state interest in a procedural rule." Id. at 381-85.  The Court considered whether: (1) the alleged procedural violation was actually relied on in the trial court and whether perfect compliance with the rule would have changed the trial court's decision; (2) the application of the state procedural rule is firmly established and regularly followed in the specific circumstances presented in the case; and (3) a party substantially complied with the state procedural rule given the "realities of trial." Id.; see Cotto, 331 F.3d at 240.

Under the specific facts of this case, New York's preservation rule is not adequate to preclude federal habeas review of Whitley's conviction.  Lee, 534 U.S. at 381-85; Cotto, 331 F.3d at 242-47.  The first Lee guidepost, whether the procedural violation was relied on by the court and whether perfect compliance would have changed the trial court's decision, weighs in Whitley's favor.  The trial court was aware that Whitley's counsel opposed the admission of Richardson's testimony and that he sought to impeach Richardson through cross-examination if Richardson were to be immunized.  The court's ruling that Richardson's recantation was

incredible as a matter of law suggests that the court would not have admitted evidence of Richardson's recantation even if Whitley's counsel specifically requested that remedy.

  The second consideration, whether the rule is firmly established and regularly followed in the specific circumstances of this case, also weighs in Whitley's favor.  As in Lee, neither the parties nor this Court could find case law directing flawless compliance with the preservation rule "in the unique circumstances of this case."  Id. at 382.  As with Lee, it appears that New York courts have not previously confronted this issue.  Id.

  The third consideration, whether there was substantial compliance with the rule given the realities of trial, also weighs in Whitley's favor.  The preservation rule is satisfied "if the party made his position with respect to the ruling or instruction known to the court" or if a party "expressly or impliedly sought or requested a particular ruling or instruction."  N.Y. Crim. Proc. Law § 470.05(2).  Whitley objected to the admissibility of Richardson's prior testimony. Whitley argued that Richardson should be called as a witness and, if necessary, given immunity against prosecution because of possible inconsistencies between his prior and his current testimony.  When Whitley's motion was denied, he objected to the admissibility of Richardson's prior testimony, but his objection was overruled.  He did not add another objection, or motion, relating to the court's neglect to add evidence of Richardson's recantation or memory failure, so that specific point was not added to the record of Whitley's objection.  But that neglect did not constitute a waiver, as the State now argues, for it was clear throughout that the court's failure to admit that evidence, or otherwise inform the jury, of Whitley's change of memory, was the very point of Whitley's objection and, as the transcript makes clear, the trial court so understood.  As the trial court explained, in response to Whitley's objection, "[t]he question then is whether

[Whitley] is being prevented from questioning the witness about Mr. Richardson's purported recantation." Tr. Jan. 9, 2002, at 187.

Thus, the State's argument, that Whitley's asserted failure specifically to object constituted an independent state ground of waiver, lacks merit. There was no waiver. The New York Supreme Court's finding of waiver was a "decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254. And an independent state ground, even if found correctly, cannot justify a materially skewed trial. See Coleman, 501 U.S. at 750. Accordingly, I hold that, under the facts of this case, New York's preservation rule does not constitute an adequate and independent ground that precludes federal habeas review.

## V.     CONCLUSION

For the foregoing reasons, Darryl Whitley's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, is granted.

Voiding Whitley's conviction, after the verdict acquitting Patrick McDowell, means that the murder of Dr. John Chase Wood remains unsolved. A retrial of Whitley may result in a verdict convicting him, or it may not. But, whatever the outcome, the value of a constitutionally valid trial is fundamental to our way of life.

The State has 60 days from today or, if a timely appeal is filed, from the issuance of a Mandate from the Court of Appeals, either to schedule a prompt retrial of Whitley or to discharge him from jail. If the State timely appeals, it shall proceed with diligence, and the date for retrial or discharge shall be 60 days after a Mandate issues.

SO ORDERED.

Dated:     July 22, 2010
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

40